## CHICAGO *v* SHELDON.

1. The clause in the ordinance of May 23d, 1859, by which the city of Chicago granted to the North Chicago City Railway Company the ٭ght to construct a railway, the company agreeing, that it should—

"As respects the *grading, paving, macadamizing, filling, or planking of the streets or parts of the streets,* upon which they shall construct their said railways, or any of them, keep eight feet in width along the line of said railway on all the streets where one track is constructed, and sixteen feet in width along the line of said railway where two tracks are constructed, *in good repair and condition* "—

does not make the company liable for curbing, grading, and paving the streets with an entirely new pavement. The obligation of the company extended to repairs only.

2. A contract having been entered into between parties, valid at the time, by the laws of the State, no decision of the courts of the State, subsequently made, can impair its obligation.

IN error to the Circuit Court for the Northern District of Illinois; the case being thus:

The constitution of Illinois ordains that taxes shall be levied so that each person shall pay in proportion to the value of his property; and that where corporate authorities of counties, cities, &c., are authorized to levy and collect taxes for corporate purposes, the taxes shall be uniform in respect to persons and property.

With these provisions in force, as fundamental law, the legislature of the State, in February, 1859, authorized the North Chicago City Railway Company to construct and operate a single or double track of a horse railway on certain streets of the city, "in such manner and upon such terms and conditions, and with such rights and privileges as the said common council may, by contract with said parties, prescribe."

On the 23d May, of the same year, the common council passed an ordinance by which they granted to the company permission to lay, for twenty-five years, a single or double track of railway on certain streets of the city, upon certain conditions prescribed; these conditions relating chiefly to the sort of motive power, the purposes for which the railway

was to be used, the style and class of car, the sort of track and degree of its elevation, and the rates of fare. Then followed a section thus :

" The said company shall, *as respects the grading, paving, macadamizing, filling, or planking of the streets, or parts of the streets, upon which they shall construct their said railways, or any of them,* keep eight feet in width along the line of said railway on all the streets wherever one track is constructed, and sixteen feet in width along the line of said railway where two tracks are constructed, *in good repair and condition* during all the time to which the privileges hereby granted to said company shall extend, in accordance with whatever order or regulation respecting the *ordinary repairs* thereof may be adopted by the common council of said city."

After this contract was made, and carried into execution by the railway company, and up to the year 1866, the common council passed several ordinances for the improvement of some of the streets occupied by the company, thereby providing for curbing them with curbstone, grading and paving them with wooden blocks, known as the Nicholson pavement. Under none of these, however, was the railway property of the street railway corporation assessed, except under one passed in the year last named. In that year the proprietors of certain lots fronting on streets where the railway was laid, refused to pay the assessments made on them, upon the ground that the railroad property ought to be assessed. The question between these proprietors of lots and the city was taken to the Supreme Court of the State, in the case of the *City of Chicago v. Baer*,* where it was held (the previous case of *Chicago v. Larned*,† being considered as in principle asserting that doctrine), that the legislature could not constitutionally grant power to the city to make such a contract as had been here granted to the railway company, that it was void, and that, as a consequence, the city was bound to assess the railroad property. A special tax or

---

* 41 Illinois, 306.        † 34 Id 265.

assessment of $28,677 was now accordingly imposed upon the property of the railway company, and the collection being threatened, one Sheldon, a large stockholder in the company—the company itself having declined to act—filed a bill in the court below to enjoin the collection, and the court enjoined it accordingly. From that decree the city of Chicago brought the case here, the main question being whether under their contract to keep the road for a certain number of feet " in good condition and repair," the company could be made to pay for what was a new curbing, grading, and paving, altogether, there being also some minor questions as to the effect of the decisions already mentioned.

To complete the history of the matter in hand, a fact somewhat collateral to it should be mentioned. It is that in 1864, under the authority of the charter of the railway company, the common council entered into *another* contract with it in respect to laying tracks in *other* streets. The grant in this new case was made, " subject to all the restrictions and conditions, rights and privileges in the previous ordinance of the 23d of May, 1859, to the same company, *except as herein* otherwise provided." The fifth section provided, *as in the first contract*, for keeping the eight and sixteen feet of the street in good condition and repair, but it *provided further, and in addition, that, when any new improvement, paving, &c.,* should be ordered by the common council in any of the streets, the *railway company should make the improvement* the width of the eight or sixteen feet, as the case might be.

*Mr. Tuley,* for the city, argued—

That a party, and especially a monopoly, setting up exemption from city assessment, should show its privilege under an *express* contract; such exemption being against common rights, and not to be favored; that, plainly, no such exemption was contracted for here.

That as the Supreme Court of Illinois had jurisdiction of the parties, and had power to decide the subject-matter in controversy in the case of *Chicago v. Baer*, that decision was final and conclusive; the decision there not coming before

this court on writ of error, as required by the twenty-fifth section of the Judiciary Act, if it was to be re-examined; and it being the established doctrine of this court that it will adopt and follow the decisions of the State courts in the *construction of their own constitution* and statutes, when that construction has been settled by the decisions of its highest judicial tribunal.

That if any prior decisions appeared to authorize the legislature to make contracts commuting the right of specific taxes or assessments, the case just named and that of *Chicago v. Larned,* had essentially modified them.

That the legislature could not authorize the city of Chicago, and did not mean to authorize it, to make a valid contract by which the railway company would be exempted from the payment of its portion for street improvements, in proportion to the benefits received; which was what the railway corporation did, in fact, pretend was done by the contract set up.

Mr. Justice NELSON delivered the opinion of the court.

It is asserted, on the part of the railway company, that by the true construction of their contract, they are exempt from the assessment made upon their property, and the seventh section of the ordinance of the 23d May, 1859, is referred to and relied on in support of this construction. That section prescribes the obligations and duties of the company in respect to the condition and repairs of the streets during the whole period of the running of the contract, and imposes certain burdens upon it as to repairs, from which, to their extent, the city, or adjoining owners of lots, are relieved. It is insisted that this provision was intended, and so understood by both parties, as regulating the whole subject as it respects improvements of the streets occupied by the company, and to fix in the contract the extent of their liability.

The language of it is somewhat peculiar, and it cannot well be denied but that a fair and reasonable interpretation favors this view. It is as follows: "The said company shall, as respects the *grading, paving, macadamizing, filling, or plank*

*ing of the streets, or parts of the streets,* upon which they shall construct their said railways, or any of them, keep eight feet in width along the line of said railway on all the streets where one track is constructed, and sixteen feet in width along the line of said railway where two tracks are constructed, in good repair and condition." Now, it is quite clear that the above recitals embrace the whole subject of improvements of the streets, and that it was present to the minds of the parties when entering into the stipulation respecting repairs that followed. And this being so, it is difficult to deny, but that these stipulations were made as fixing the proportion or share of these general improvements which should be imposed on the company, namely, they should keep in good condition and repair eight or sixteen feet, as they used a single or double track, along the entire length of the road. They were not to grade, pave, macadamize, fill, or plank even the above width or distance, except so far as such work came within the category of repairs.

What adds great weight to this view is, it accords with the practical construction given to the contract by both parties. It was entered into, as we have seen, on the 23d May, 1859. Several of these special assessments were authorized subsequently by the common council and collected, but no attempt was made to assess the railroad property of the company. Nor was any question raised as to its exemption till 1866, and not then by the city, but by some of the proprietors of lots fronting on the streets. In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence. The interest of each, generally, leads him to a construction most favorable to himself, and when the difference has become serious, and beyond amicable adjustment, it can be settled only by the arbitrament of the law. But, in an executory contract, and where its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no great danger in the adoption of it by the court as the true one.

There is another consideration in the case entitled to weight in the interpretation of this contract; and that is the language of the contract made between the city and the company in 1864.* This ordinance is *in pari materia* with the one of 1859, and helps to explain any ambiguity in it.

We may add, also, that the learned judge who delivered the opinion of the court, maintaining the liability of this company to the payment of the assessment, does not place his opinion upon the ground that the contract did not exempt it, but that the legislature were disabled by the constitution of the State from conferring any such power on the city. The objection is founded on the clauses of the constitution, which provide that taxes shall be levied so that each person shall pay in proportion to the value of his property; and that where corporate authorities of counties, cities, &c., are authorized to levy and collect taxes for corporate purposes, the taxes shall be uniform in respect to persons and property.

We are not concerned to deal with these provisions, as it is perfectly settled by the decisions of the Supreme Court of the State that, according to the true construction of them, they do not forbid the legislature commuting with individuals or corporate bodies the burdens of general or specific taxes or assessments, of the character of those in question, for what they may deem an equivalent. This has been so frequently decided that we need only refer to the cases.† It is supposed by the counsel for the city that this doctrine has been modified by the recent cases of *Chicago* v. *Larned*, decided in 1864, and *The Same* v. *Baer*, in 1866. But, on looking into these cases, we find no references to the cases above cited, or to the doctrine they maintain. If it were otherwise, however, we could not agree that such decisions could have the effect to invalidate the contract in question. A contract having been entered into between the parties, valid at the time, by the laws of the State, it is not competent

---

* See it, *supra*, p. 52.

† Illinois Central Railroad *v.* County of McLean, 17 Illinois, 291; Hunsaker *v.* Wright, 30 Id. 146; Neustadt *v.* Illinois Central Railroad, 31 Id. 484.

even for its legislature to pass an act impairing its obliga-tion, much less could any decision of its courts have that effect.

A point is made, that the legislature have not conferred, or intended to confer, authority upon the city to make this contract. We need only say that full power was not only conferred, but that the contract itself has been since ratified by this body.

JUDGMENT AFFIRMED.